FILED
United States Court of Appeals
Tenth Circuit

September 29, 2011

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

OSCAR RAUL VILLANUEVA,

     Defendant-Appellant.

No. 10-2239
(D.C. No. 1:10-CR-01006-JEC-1)
(D. N. Mex.)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE,** Chief Judge, **TYMKOVICH,** Circuit Judge, and
**FREUDENTHAL**, District Judge[**].

After examining the briefs and appellate record, this panel has determined

unanimously that oral argument would not materially assist in the determination

of this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is,

therefore, submitted without oral argument.

Defendant Oscar Raul Villanueva appeals the district court's sentence of

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

[**] The Honorable Nancy D. Freudenthal, Chief United States District Judge
for the District of Wyoming, sitting by designation.

sixty months' imprisonment for (1) conspiracy to possess heroin with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and 846; and (2) possession of heroin with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B) and 18 U.S.C. § 2. According to Villanueva, the district court should have applied the "safety-valve" provision contained in 18 U.S.C. § 3553(f) and sentenced him without regard to the statutory minimum of sixty months' imprisonment. We have jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I

*Factual Background*

On March 22, 2010, Jarrell Perry, a Drug Enforcement Administration (DEA) agent, was on duty at the Limousine Express Bus Station in Albuquerque, New Mexico. There, he observed passengers disembarking from a bus that had recently arrived from El Paso, Texas. Agent Perry specifically noticed Villanueva as he departed from the bus because he was carrying a small black satchel and no other luggage and because he walked through the bus station without meeting anyone. ROA, Vol. 2 at 4. Perry also noticed that Villanueva's tennis shoes were bulging. Id. Suspecting that he might be transporting narcotics in his shoes, Perry approached Villanueva, displayed his DEA badge, and asked for permission to speak with him. Id. Villanueva eventually gave Perry permission to search him, and Perry then handcuffed him in order to perform the search. Id. While

2

conducting the search, Perry lifted up the innersole of Villanueva's shoe and found a substance wrapped in plastic wrap that was later confirmed to be heroin. Id.

After Agent Perry removed the handcuffs, Villanueva "attempted to flee the area on foot." Id. Following a "short chase," Agent Perry apprehended Villanueva and placed him under arrest. Id. Shortly thereafter, Rudy Villarreal, an officer with the Bernalillo County Sheriff's Office who speaks fluent Spanish, approached Agent Perry and offered his assistance. Id. From then on, Agent Perry communicated with Villanueva through Officer Villarreal. Id. After Villanueva was informed of his *Miranda* rights, he agreed to speak with Agent Perry. Id. Villanueva stated that he was being paid $1,000 to deliver the drugs to someone in Albuquerque who was going to call him on the cell phone he was carrying in the black satchel. Id., Vol. 2 at 4-5. At Agent Perry's request, Villanueva agreed to call the person and set up a meeting to deliver the drugs. Id., Vol. 2 at 5.

A few minutes later, Jorge Aispuro-Aristegui drove up to the front of the bus station, spotted Villanueva, and signaled for him to come to the car. Id. Villanueva walked up to the passenger side of the car and spoke through the passenger side window, which was slightly open. Id. As Villanueva began to enter the car, DEA agents opened the driver's side door and arrested Aispuro-Aristegui. Id.

3

Villanueva was subsequently taken to the DEA office in Albuquerque.  Id.

There, officers searched his satchel and found a few pieces of paper with illegible

notes scribbled on them and three bundles of cash totaling $4,250.75.  Id.  Each

cash bundle was folded in half and wrapped in rubber bands.  Id.  Villanueva

agreed to speak with DEA agents through an interpreter.  Id.  He admitted to

knowingly transporting drugs, although he claimed that he did not know the type

or quantity of the narcotics that had been placed in his shoes.  Id., Vol. 2 at 6.

Villanueva also told the agents that a friend in Mexico had asked him if he

wanted to earn $1,000 by transporting drugs from Mexico to El Paso and that he

agreed to do so because he needed the money.[1]  Id.

Villanueva further informed DEA agents that two weeks after he spoke with

his friend, he received a telephone call from a man known as "Pariente" asking if

he was willing to transport drugs.  Id.  Villanueva agreed to travel to El Paso to

meet with him.  Prior to traveling to El Paso, Villanueva renewed his visa, which

enabled him to legally travel to and from the United States.  Id.  Villanueva

initially informed DEA agents that he arrived in El Paso on Friday, March 19 and

spent the weekend in El Paso with Pariente's friends.  Id.  However, when DEA

agents told Villanueva that records obtained from the El Paso Intelligence Center

---

[1] In his opening brief, Villanueva states that he has had serious financial troubles resulting from a car accident in which he fractured his arm and from medical treatment for his mother's "diabetes, kidney failure, hypertension, and lumbar spine problems."  Aplt. Br. at 6.

(EPIC) indicated he had traveled multiple times between El Paso and Cuidad Juarez that weekend, Villanueva admitted that he stayed the weekend in a hotel in Ciudad Juarez, Mexico and not in El Paso. Id. Villanueva then stated that he met with Pariente at the hotel and discussed the pending drug transaction. Id. Pariente gave Villanueva the shoes, the black satchel, the cell phone, and instructions regarding how to deliver the drugs to Aispuro-Aristegui in Albuquerque. Id.

On April 5, almost two weeks after his arrest, Villanueva and his attorney met with DEA agents and the federal prosecutor for a "debriefing." Id., Vol. 2 at 7. Villanueva stated that he first traveled from El Paso to Albuquerque on March 19 with his friend Cesar Valenzuela, who was looking to purchase a car in Albuquerque. Id., Vol. 2 at 8. He further stated that while he waited for Pariente in Cuidad Juarez during the weekend of March 20, he crossed into the United States several times to shop with money Pariente had previously given him for expenses. Id.

DEA agents questioned Villanueva regarding the notes and money found in his possession on March 22. Id. When asked about the notes, Villanueva stated that they were "just notes" and were not related to any other trips from Mexico to the United States. Id. When asked about the money found on his person, Villanueva stated that the money belonged to him and that he was going to use it to pay for arm surgery and to buy vitamins and nutrition supplements, which he

5

planned to sell for profit in Mexico.  Id., Vol. 2 at 8-9.  Villanueva stated that he arranged the money in the three bundles "for no particular reason," and he denied that he had received the money from drug trafficking.  He also insisted that he had never previously delivered drugs to anyone.  Id., Vol. 2 at 9.

*Sentencing*

Villanueva subsequently pled guilty to possession with intent to distribute and conspiracy to possess with intent to distribute.  The district court set a date for sentencing, and the probation office prepared a presentence report.  Because DEA officials recovered over 980 grams of heroin from Villanueva's shoes, the probation office set his base offense level at thirty.  The probation office gave Villanueva a two-level reduction for playing a "minor role" in the offense and a three-level reduction for acceptance of responsibility.  See USSG §§ 3B1.2(b), 3E1.1.  Because Villanueva had no criminal history, he was given a criminal history category of I.  Combined with an offense level of 25, this created a guideline range sentence of sixty to seventy-one months with a mandatory minimum sentence of sixty months under 21 U.S.C. § 841(b)(1)(B)(I).

At sentencing, Villanueva argued that he qualified for a safety-valve sentence under 18 U.S.C. § 3553(f), which requires district courts to sentence certain first-time drug offenders without regard to the applicable statutory minimum sentence.  In order to prove this assertion, Villanueva had subpoenaed Agent Perry, and he was present in the courtroom.  Villanueva asked the district

6

court to permit him to call Agent Perry to testify regarding Villanueva's cooperation with the DEA investigation. The district court denied this request, stating to Villanueva's counsel that "You've said everything he's going to say, so I've heard it." Aplt. Br., Ex. B at 6. The district court then gave the government the chance to respond. It opposed Villanueva's request for a safety-valve sentence, arguing that he did not "truthfully provide[] . . . all information and evidence" he had relating to his drug-trafficking offense as required by 18 U.S.C. § 3553(f). After permitting Villanueva to speak, the district court denied his request for a safety-valve sentence and sentenced him to sixty months' imprisonment.

## II

### *Standard of Review*

"We review a district court's factual determination on safety-valve eligibility for clear error, including whether a defendant has provided the government with complete and truthful information." United States v. Cervantes, 519 F.3d 1254, 1256 (10th Cir. 2008) (citation omitted). We review de novo a district court's "legal interpretation guiding its application of the safety-valve provision." Id. We review for abuse of discretion the question of whether a district court afforded the defendant an adequate opportunity to present evidence. United States v. Rutter, 897 F.2d 1558, 1566 (10th Cir. 1990).

7

*Analysis*

Villanueva claims the district court erred by (1) concluding that he was not entitled to a safety-valve sentence, and (2) refusing to permit him to call Agent Perry to testify. We address both arguments in turn.

A.    *Safety-Valve Sentence*

Under 18 U.S.C. § 3553(f), district courts are required to sentence certain first-time drug offenders "without regard to any statutory minimum sentence." See also United States v. Jeffers, 329 F.3d 94, 100-01 (2d Cir. 2003). The basic purpose of this "safety-valve provision" is to "mitigate the harsh effect of mandatory minimum sentences on certain first offenders who played supporting roles in drug-trafficking schemes." United States v. Ortiz-Santiago, 211 F.3d 146, 152 (1st Cir. 2000). "[W]ithout such a safety valve, for 'the very offenders who most warrant proportionally lower sentences—offenders that by guideline definitions are the least culpable—mandatory minimums generally operate to block the sentence from reflecting mitigating factors.'" United States v. Acosta-Olivas, 71 F.3d 375, 378 (10th Cir. 1995) (quoting H.R. Rep. No. 103-460, 103d Cong., 2d Sess.). Thus, this provision is designed to prevent the "least culpable offenders [from] receiv[ing] the same sentences as their relatively more culpable counterparts." United States v. Pena-Sarabia, 297 F.3d 983, 988 (10th Cir. 2002) (quoting H.R. Rep. No. 103-460).

A defendant must meet five requirements in order to qualify for a safety-

8

valve sentence under 18 U.S.C. § 3553(f). The defendant has the burden to prove by a preponderance of the evidence that he or she meets each of these requirements. United States v. Altamirano-Quintero, 511 F.3d 1087, 1098 (10th Cir. 2007). There is no dispute in this case that Villanueva satisfies the first four requirements, which are: (1) the defendant does not have more than one criminal history point; (2) the defendant did not use violence (or the threat of violence) or possess a weapon in connection with the offense; (3) the offense did not result in death or serious bodily injury to any person; and (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense. 18 U.S.C. § 3553(f)(1)-(4). In order to satisfy the fifth requirement, the requirement at issue in this case, the defendant must "truthfully provide[] to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan." Id. § 3553(f)(5).

The meaning and scope of the phrase "same course of conduct or of a common scheme or plan" in § 3553(f)(5) is important. The Sentencing Guidelines state that this phrase refers to "the offense of conviction and all relevant conduct." Acosta-Olivas, 71 F.3d at 378 (quoting USSG § 5C1.2, comment (n.3)). Offenses are considered "relevant conduct"—and therefore part the same course of conduct or a common scheme or plan—if they are "substantially connected to each other by at least one common factor, such as

9

common victims, common accomplices, common purpose, or similar modus operandi." USSG § 1B1.3, comment (n.9(A)). Such offenses must be "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." Id., comment (n.9(B)). In other words, there must be "distinctive similarities" between the offenses "that signal that they are part of a single course of conduct rather than isolated, unrelated events." United States v. Ortiz, 613 F.3d 550, 558 (5th Cir. 2010) (quotations omitted).

Villanueva claims the district court clearly erred in not granting his request for safety-valve relief because "the record reflects that [he] provided the government with all the information he knew about the instant offense and its relevant conduct." Aplt. Br. at 27. In support of this assertion, Villanueva points to his cooperation at the time of his arrest in securing the arrest of Aispuro-Aristegui and at his subsequent debriefing with DEA officials and the federal prosecutor. Villanueva alleges that, in both instances, he "truthfully provided to the Government all information and evidence" he had regarding his criminal conduct, as required by 18 U.S.C. § 3553(f)(5).

We disagree. Villanueva would have us limit the "same course of conduct or of a common scheme or plan" in § 3553(f)(5) to his actions on the date of his arrest and his subsequent debriefing. But while Villanueva cooperated with DEA officials on these occasions, the record indicates that he did not "truthfully

10

provide[] to the government all information and evidence," 18 U.S.C. § 3553(f)(5), about a number of important facts relating to "the offense of conviction and all relevant conduct." USSG § 5C1.2, comment (n.3). First, Villanueva was not truthful with law enforcement authorities regarding when he arrived in El Paso or where he stayed prior to March 22. Villanueva initially told DEA officers that he did not arrive in El Paso until March 19 and that he stayed in El Paso with Pariente's friends until March 22. ROA, Vol. 2 at 6. Villanueva changed his story, however, when DEA officials informed him that they had evidence that he had crossed from Mexico into El Paso on March 15 and 16 and everyday from March 18 until March 22, the day of his arrest. Id., Vol. 1, Dkt. #57 at 3.

Second, Villanueva's explanation for the money found in his possession— more than $4,000 arranged in three separate bundles—is unconvincing. Villanueva stated that he arranged the money this way for "no particular reason." Id., Vol. 2 at 9. The government claims Agent Perry would have testified at sentencing that, based on how the money was arranged, the bundles were "proceeds for acting as a drug courier on previous occasions." Aple. Br. at 19. Although the district court did not permit Agent Perry to testify, it could have easily made the same inference on its own. Further, Villanueva's claim that he had more than $4,000 in cash to pay for arm surgery and to purchase vitamin supplements is unconvincing because he told DEA officials that he agreed to

11

smuggle the heroin to improve his dire financial situation. ROA, Vol. 2 at 5-6. Given Villanueva's alleged financial troubles, his claim that he went back and forth several times from Mexico to El Paso prior to March 22, not to peddle drugs, but "to go shopping," is also hard to believe. Id., Vol. 2 at 8.

Finally, Villanueva never provided a satisfactory explanation for the illegible notes found in his possession. He claimed the documents were "just notes" but never actually explained what the notes were for. ROA, Vol. 2 at 8. The fact that Villanueva never provided an explanation for these notes undermines his claim that he fully disclosed to the government all of the information he possessed regarding "the offense of conviction and all relevant conduct." See USSG § 5C1.2, comment (n.3).

### B. Testimony from Agent Perry

Villanueva argues that the district court abused its discretion in refusing to permit Agent Perry to testify at the sentencing hearing. According to Villanueva, Perry's testimony would have supported his request for a safety-valve sentence because Perry would have testified that Villanueva (1) cooperated at the time of his arrest; (2) gave truthful information regarding the transaction and the parties involved; (3) assisted in Aispuro-Aristegui's arrest; and (4) answered every question asked of him in the debriefing interview. Aplt. Br., Ex. B at 3-4.

Defendants must be given an "adequate opportunity to present relevant information to the court," but they do not have an automatic "right to introduce

12

live testimony" at sentencing. United States v. Pena-Hermosillo, 522 F.3d 1108, 1116 (10th Cir. 2008). Nonetheless, this court has held that the representations of counsel alone will "[r]arely ever be sufficient . . . to grant safety-valve request over the objection of counsel." United States v. Cervantes, 519 F.3d 1254, 1258 (10th Cir. 2008). Consequently, "[a]bsent a favorable recommendation from the government, a defendant needs to put on evidence at the sentencing hearing to meet his burden of showing that he truthfully and fully disclosed everything he knew and to rebut the government claims to the contrary." Id. Such evidence will, "in all likelihood," include "testimony from the defendant or a representative of the government subject to cross examination." Id.

The better approach for the district court would have been to permit Agent Perry to testify. Id. Nonetheless, we conclude that the district court did not abuse its discretion because Perry's testimony would not have changed the fact that Villanueva was not entirely truthful with DEA agents. Even if the district court accepted Agent Perry's proffered testimony as true, the substance of this proffered testimony was not disputed. Further, the fact remains that Villanueva provided incomplete or misleading information regarding (1) when he crossed between Mexico and El Paso; (2) his financial situation and whether a lack of funds was the reason he agreed to smuggle drugs; (3) what the notes in question addressed; and (4) why he was carrying over $4,000 arranged in three separate bundles. Thus, while Agent Perry might have testified regarding to extent to

13

which Villanueva cooperated with DEA agents, these facts were not disputed. His testimony would not have established that Villanueva "truthfully provided to the Government all information and evidence" regarding the crime of conviction, as required by 18 U.S.C. § 3553(f)(5) (emphasis added).

## III

The judgment of the district court is AFFIRMED. Villanueva's unopposed motion to seal the briefs is GRANTED.

Entered for the Court


Mary Beck Briscoe
Chief Judge